Good morning, Your Honors. I wish to reserve two minutes in rebuttal at the end of the argument. The case now before you concerns the story of a heroine, a very brave young woman who fled from her country, from Armenia, over a 12,000-mile journey to the safe haven of the United States. In so doing, she resisted tyranny that was brought upon her by the government of Armenia. They physically attacked her, her sister. They searched for her mother to arrest the mother. They did arrest the father, beat and torture him on four different occasions. And they physically threatened the petitioner at her place of employment, beating her to the ground, threatening to arrest her, all on account of her political opinion and that of her father, who was a hero in his native land. After the attack at the place of employment, the government then sought to capture the petitioner, and she eventually ran away, fleeing to Russia for a brief time and then traveling to the United States. Here, she was reunited with her parents and her siblings. She's been devoted to her family all her life. She's found redemption in the United States. She's now married to a U.S. citizen. She's the mother of a U.S. citizen child. You said that you were going to file an application for adjustment of status. Is that an avenue that's available to you, and have you done that? It is available, Your Honor. The petitioner was paroled into the United States. That makes her statutorily eligible for adjustment of status. She is the beneficiary of an approved immigrant visa petition. Has it already been approved? The petition has been approved. And to be upfront and honest with the court, we have applied for adjustment of status. The adjustment requires a waiver, that is, a forgiveness for the petitioner's fraudulent act. When she came to the border, a smuggler handed her a green card belonging to another. She presented the card to the officer at the port of entry. That is fraud. She can be forgiven. The law allows for that through her U.S. citizen spouse. We did try. We filed an adjustment application around August of last year. The government denied the case in late December, saying that we had not proven that the U.S. citizen spouse would suffer extreme hardship, which is the required element. And what the government pointed to was we only submitted his sworn declaration, no other objective evidence, psychological report, psychiatric report, physician's report. So have you filed a petition for review with us on that case? That is not reviewable by the court. Adjustment of status cannot be reviewed by the court. However, we are not limited to only one application. We are putting together a second application. We have sent the petitioner's spouse to a psychologist. We're waiting for the final report. Once we have that, we put a package together of another adjustment package and file it with the California Service Center. It will take between six to eight months from filing for a decision. Okay, just a second. Now I think you're saying something different. I asked you whether you had filed the application that you said you would, and you said yes, but you were talking about the August one, and you haven't filed the adjustment of status application waiver application that you said you would file by May 9th. I'm waiting for the psychological report. Okay, so that is not filed. So there's nothing pending out there right now. It's in the loop. All right. What about hardship to the U.S. citizen child? Hardship to a citizen child is not part of what the government will look at for a waiver. However, hardship to the child can be reflected in hardship to the spouse, and that is part of the hardship. So the answer is yes, but it has to be explained in a certain way. So what does that do to the case before us? I mean, where are we here? The case before this Court concerns an asylum application that was denied by the immigration judge six and a half years ago. The judge was overruled on appeal in terms of the petitioner's credibility. So now we take her testimony as deemed credible? Yes. Okay. And if her testimony is credible, then the Board should have accepted the nexus from her political opinion, that is, the reason why the persecutors attacked her and threatened her, is based on one of the five protected grounds. Then we move to the next issue is whether whatever happened to the petitioner, is that sufficient, is that enough for a trier of fact to conclude that she either suffered past persecution on one of the five protected grounds, or if she were returned to her homeland, would she then suffer persecution? And we need to show a 10 percent likelihood that she would suffer the persecution. The cases that we have cited in Petitioner's brief are the same cases that the government has cited in its brief, but there's a different twist to the way that we view the application. We have said that if credibility has been established, that means that there's a sufficient nexus, because that's part of the petitioner's claim. Okay, so with respect to past persecution, assume the incidences were as a result of imputed political opinion, her father's and her mother's act, and her own expressed opinion. How did the incidences rise to the level of persecution? The Ninth Circuit has certainly faced these issues in the past. In our brief, beginning at page 31 and following through to page 41, we cite perhaps 25 cases that explain death threats, violence against family, vandalism of residents, threat of mob violence, economic harm, and emotional trauma is enough. That's Mashiri v. Ashcroft, and that's cited in our materials. What the Ninth Circuit has said is you don't need blood, you don't need broken bones, and you don't need a corpse to establish persecution. So the totality of circumstances is what should rule. Okay, so assume we found that there was past persecution on account of a protective ground, then the presumption of future persecution arises. Do we need to remand to the BIA to consider that? Well, there's one remaining issue. No, I don't think so, if you do it on the record. But the Court recently asked counsel and opposing counsel for a letter brief on the issue of whether the matter should be remanded. To afford to the Board of Immigration Appeals the opportunity to look at evidence that has arisen in the past seven years. The changed country conditions. The changed country conditions. And what's your position on that? My position is that the most recent Department of State report tells us that there are very serious violations of human rights that continue, the same violations of human rights of which the petitioner has complained. So there are no changed country conditions? He said it was bad before and it's bad now. That's correct.  But not a difference? The only difference is that Robert Pocharian, who was the president of Armenia at the time the petitioner fled from her country, and he was at the top persecuting petitioner's father, is now running for president again. And I did make a brief statement on that. I did find that article one day before submitting the brief. Do we have the current country State Department report in the record? No. Okay. It would not be in the record. The record was complete, I believe, from 2006. All right. September of 2006. So do you agree with the government, I think, that it doesn't go back to review for changed country conditions? I don't necessarily agree with that position because the country reports support petitioner's position. There is no change that makes her, for example, if she once had a case, fear of persecution, but the conditions today show she would not. That's not what we have here. We have conditions that show that the government of Armenia is still persecuting political opponents, murdering people. I simply cited the most relevant passages from the country reports. But there's a lot more. I'm limited to five pages. I couldn't give you everything. All right, counsel. Your time will hear from the government. Thank you very much. Good morning, Your Honors. Anne Welhoff for Respondent, Attorney General Holder. May it please the Court. Your Honor, this case is before you on the issues of the agency's denial of the asylum application. And before this Court, the substantial evidence standard of review applies, as the Court knows. It's an extremely deferential standard. And the petitioner is required to point to evidence that would compel a conclusion contrary to that of the agency. The agency concluded that, first, the petitioner had not established past persecution. And that determination is well-grounded in the evidentiary record here. But the BIA, I guess I'll make sure I understand, reversed the immigration judge on the adverse credibility finding, correct? That's correct. They didn't adopt that portion. Right. But still, she had not met her burden? Well, that's correct. Basically, the board deemed her, rejected the adverse cred and said, we'll take her testimony as credible. But still, it failed on lack of burden of proof. The evidence simply did not rise to the level of persecution. And that determination is subject to the extremely deferential standard. I would point the Court to the actual testimony. Basically, there was two incidents about which the petitioner had testified constituted her past persecution. The first instance was July of 2004. And pretty much the totality of that incident is described at the administrative record, page 127 to 131. And if you look at what she described occurred there, there's absolutely no evidence that there was any seeking by government officials of this individual because of her political opinion. Nor is there evidence that they were imputing to her any opinion of her father's. The record is pretty vague as to what exactly were the political beliefs that were purportedly imputed. There was very just all the testimony was vague in that respect. Petitioners stating things like, my father advocated for democracy. I mean, that was pretty much the extent of what was described as an incident. But wasn't her father a political dissident? Well, I mean, I don't know if I would call him a dissident. He was politically active for change in our media. He was against the government. In the democracy movement. But there's simply, if you look at the two incidents about which Petitioner testified, there's no evidence that the government was imputing that position, political opinion to her, first and foremost. Secondly, they mistreated her, but not all mistreatment rises to the level of persecution. And that's what the agency found here. How about the second incident? Well, if you look at the second incident, first of all, again, literally administrative record at page 151. This is what she says that the agent said to her when they came into the conference room to question her. Your father participated in many nonsensical demonstrations that are useless anyway. That was. No, she alleged she was beaten and kicked and the interrogator shouted that a traitor like her, the child of a traitor, had no right to work for the government. Well, and then they left threatening that she would with threats, which that she would hear from them again. And that they'd previously ransacked the house looking for the mother. Well, on this day, are you talking about the first incident in July? In July, they went to the house to look for the mother. Okay. I don't want you to lose focus from what Judge Wermont just said. Okay. Yes, Your Honor. The testimony she said they hit and kicked her because she said they told her your father made these useless demonstrations. She said, I'm sympathetic to my father. She said they then twisted her arm, kicked her. She said basically she agreed she was against the government, too. She said, I support my father. I'm sympathetic to him. I'm not. There was no specific discussions, but she did say, I'm sympathetic to my father. And they pushed her and kicked her. That was definitely mistreatment. And they left. She went home on her own. They told her, don't go back to your work. And she took that as a threat and didn't go back to her work. But the agency concluded that that didn't rise to the level of persecution. Can I ask you a question? If the agency's decision that there was no past persecution can be sustained, in this particular case because of the threats, is there still an objectively reasonable fear of future persecution? Well, the agency concluded that there was not. I'm just asking you, isn't there a difference here where you have a case that involves threats of future harm, that even though they may not have done anything yet, if they're threatening future harm, doesn't she have an objectively reasonable fear of future persecution? Well, threats standing alone, I mean, you have to look at the case. Threats with some kicks and physical mistreatment that may not have risen, this is my hypothetical, may not have risen to past persecution. If you combine those with threats about we're going to do bad things to you in the future, does that support a reasonably objective fear of future persecution? I guess the answer is it could on the right facts. The agency decided in this case that she had not demonstrated a well-founded fear of future persecution and did not demonstrate that the government still has any ongoing interest in her. I think at the point that she was testifying, her entire family, I believe, had left. There was really no evidence that they were seeking her because of her opinion. The two times they sought her, they seemed to be asking her, where's your mother, where's your father? There doesn't appear to be an independent interest in her particularly. But they also threatened and beat her. They told her they didn't believe her, that she didn't know where her father was. She was a traitor. She was a traitor like her father, and they beat her, and they threatened her that they'd be back. I wasn't there. Maybe it was another incident or it was one of these incidents where they had ransacked the family's house looking for the mother, and that on that occasion the authority slapped both the petitioner and one of her sisters. That was the July of 2004 incident at her house when, after the parents were at the protest, they went and asked where the mother was. She said, I don't know. They didn't believe her and slapped her, and they left. So there was definitely two incidents where they were coming towards her asking, where is your father? And they were unpleasant and definitely mistreatments, but the agency determined that they weren't sufficient to rise the level of persecution. Let me ask you, does change country conditions matter here? Well, if there is change country conditions that affect her particular risk and her fear, there's an avenue that can be taken, and that's bring a motion to reopen before the agency to consider those change country conditions, which has not occurred here. In response to your Honor's order, although I don't believe that issue before the court, I did undertake some independent reading myself. I don't see anything that particularly appears to stand out as new or different that would affect this particular individual's risk of harm. Again, it's not really clear to me what her political view was. So what about the fact that in April, we had the 204 incident where she came, she met with these high government officials, and her whole body and face were covered with bruises from the beating that she suffered. She stayed at home. She began to receive threatening calls. She was warned not to return to the workplace unless she suffers severe consequences. And then in April, the government agents went to her aunt's house, and they were looking for her. My recollection was there was threatening phone calls. Well, this is in her sworn statement. And so they were looking for her in April. So that's a third incident. And she was actually, I guess at that point, she had moved to the house. In August of 2005, after the second incident. So there's three incidences, not just two. Well, the testimony was that there was these threatening calls. I don't recall testimony about a physical visit. This sworn statement states that. I mean, I don't really care what you recall or don't recall. I care about what's in the record, okay? I understand, Your Honor. I understand, Your Honor. Again, the agency considered the evidence and believed that it simply, one, didn't show an imputed political opinion, or two, that the harm suffered was sufficiently severe to rise the level of persecution. It was definitely mistreatment. As to her claim that there was some discrimination on her Iranian heritage, again, the agency found this particular individual, there's no evidence she was politically active. The threats were generalized and vague. She was never arrested, detained. It doesn't appear there was serious medical harm or that she sought medical treatment, other than what she testified to, bruising. Let me just ask you, because you're out of time, but let me ask you, the adjustment of status, do you have any position on how that affects this current matter? I don't think that it affects the issues before the Court, but prior to this, Petitioner's counsel did approach me. I wish he had approached me sometime earlier. It would have been helpful because it sounds like they have something in the works administratively that might work out for them. Respondent would like to see that work out for them. But we have this adjudication that needs to be dealt with. We did talk about it as a possible option, and I'll talk more with him after, maybe putting it on hold or mediation while I see what is going on with that. But I really was never approached. You didn't write this brief, right? Correct. So how did you come to be the one? Was the DOJ just sending you out for the next couple of cases? How was I the lucky one? Yeah. Well, basically they often pool them because it's a lot of money to fly each individual attorney out, and so I was assigned three cases. In fact, none of them were mine. And one of them is dropped. Now I'm handling another case as well. At this point, it was really just budgetary that they consolidate the cases and give them to one attorney. So how familiar are you really with the whole thing? I'm familiar, Your Honor. I did go through the entire record. I apologize if I don't recall that specific visit. Okay. Let me just ask this. Do you know the status of the asylum claims of the father and the mother? They were not approved. So do you know where they are now? They're here. They're still here. And I believe the father's pending review, too. But they're still here. They're both pending review. Yes. They're both on appeal to us. Yes. They're all still here. And I'm not sure whether they have any additional administrative things going on, though. I don't know. Okay. So you just said a minute ago you're willing to do mediation. Should we maybe send you to Ninth Circuit? What I thought would be an idea as he approached me was, and I wish we had done this before we came out here, but I have seen in the past where there's an administrative option being pursued, where the court's willing to put it on their mediation docket, and we work to try and resolve that, which could potentially just moot out the whole matter. This appeal? It could. It could, yeah. But what I outlined to him this morning was that since we're here, perhaps it's appropriate we argue the case, but we could still place it in mediation and see if it gets moved out by these other options. As he pointed out, she's married and has a child. There's an approved petition. Potentially he believes he has a very strong waiver case at this time. I don't know, and I don't make those decisions. Okay. So, no, I think you did the right thing by doing the argument, because in case mediation should fail, at least we have the argument, and we could at that point rule in this case. But I think we will consider sending an order, ordering this to mediation and vacating submission. Is that all right with you? Yes, Your Honors, and I would thank the court. All right. That's agreeable, Your Honor. We had discussed that with you. All right. Thank you. We will do that. Thank you. Thank you.
judges: Restani, Wardlaw, Murguia